**WESTERN MARYLAND RAILWAY COMPANY, a body corporate**

v.

**COMMODITY CREDIT CORPORATION, a body corporate.**

**Civ. No. 7658.**

United States District Court
D. Maryland,
Civil Division.

Sept. 9, 1957.

Paul S. Parsons, Baltimore, Md., for plaintiff.

Leon H. A. Pierson, U. S. Atty., and J. Jefferson Miller, II, Asst. U. S. Atty., Baltimore, and Donald B. MacGuineas, and Arthur H. Fribourg, Attys., Dept. of Justice, and Katherine A. Markwell, Atty., Dept. of Agriculture, of Washington, D. C., for defendant.

THOMSEN, Chief Judge.

Plaintiff Railway Company has sued Commodity Credit Corporation (C.C.C.), demanding $12,681.67 additional storage charges on various carloads of grain shipped by C.C.C. to plaintiff's grain elevator at Port Covington, Baltimore, Md., for export during the period 15 December 1950 to 31 August 1953, while Car Service Order 871, issued by the Interstate Commerce Commission (I.C.

C.), was in effect. Plaintiff has been paid its storage charges on all the grain involved in this action, beginning *twenty* days after the arrival of each car, as called for by plaintiff's tariff of storage charges. Plaintiff is now claiming that Car Service Order 871 amended that tariff so that plaintiff is now authorized to charge for storage on all such cars of grain beginning *seven* days, exclusive of Saturdays, Sundays and holidays, from the arrival of each car.

Defendant's motion for summary judgment is based on the contention that Car Service Order 871, which reduced the free time on "any boxcar held for unloading", dealt with demurrage tariffs, i.e. charges for detention of rolling stock, assessed on a per-car-per-day basis, and had no effect on tariffs fixing storage charges for grain, assessed on a per-bushel-per-day basis by plaintiff in its capacity of warehouseman. The parties are agreed that unless Car Service Order 871 modified the tariff with respect to storage charges, plaintiff is not entitled to recover the additional charges claimed in this case.

The relevant facts on this issue are the orders and tariffs issued by I.C.C. and by plaintiff, respectively, and certain additional facts included in affidavits filed by plaintiff, in plaintiff's answers to interrogatories, and in statements made by plaintiff's counsel at the hearing. Whether the delay in unloading the cars was due to any fault on the part of plaintiff is in dispute, but it is agreed that it was not due to any fault on the part of defendant, which had no control over unloading. Any such fault on the part of plaintiff might be an additional defense to C.C.C., but it is not material to the legal issue raised by the motion for summary judgment, as to which the facts are undisputed, and which should be disposed of before embarking on a long trial, tracing the history of each shipment.

Car Demurrage Rules and Charges, Freight Traffic No. 4–Z, I.C.C. No. 4257, was published effective 20 February 1950, and was in effect on 15 December 1950, when Car Service Order 871 became effective. Item 10 of Tariff No. 4–Z provided:

"The following cars are not subject to Demurrage Rules and Charges, published in Section No. 1, pages 39 to 50, inclusive. * * * (b) At the ports on cars containing freight for transshipment to or from vessels * * *, on cars containing export traffic, when rules and charges applicable thereto are provided in the tariffs of the individual carriers lawfully on file with the Interstate Commerce Commission, except to the extent indicated in such tariffs. This exception also applies to such cars when held in transit because they cannot reasonably be accommodated at the ports."

From August 1, 1950, through August 11, 1953, plaintiff had in effect local freight tariffs covering the charges, rules and regulations governing the handling of grain at its Port Covington elevators.[1] For the purposes of this action the provisions in the tariffs were identical, and they will be referred to herein collectively as plaintiff's Tariff 8942. The charges therein stated were in addition to the rates for transportation and covered the various services at the Port Covington elevators.

Tariff 8942 called for the assessment of the elevator storage rate of $\%_{100}$ cent per bushel on grain held in cars at Port Covington after the expiration of the twenty days free time. This provision brought Tariff 8942 within the exception in Item 10 of Tariff 4–Z, quoted above, so that such cars were not subject to the demurrage charges called for in Tariff 4–Z. All railroads made similar provisions for grain at ports in Trunk

---

1. Tariff I.C.C. No. 8942 was effective August 1, 1950. That tariff was cancelled effective June 1, 1951, and replaced by tariff I.C.C. No. 8969. Tariff No. I.C.C. 8969 was cancelled effective September 1, 1952, and replaced by tariff I.C.C. No. 8999, which in turn was cancelled effective August 11, 1953, and replaced by tariff I.C.C. No. 9028.

Line Territory. The tariff for storage and handling of grain at such ports has long provided for twenty days free time and thereafter for the application of the storage charge and not demurrage. Free time on other commodities shipped in boxcars to such ports did not exceed seven days. It does not appear, however, what tariffs had been published by Western, Southeastern and Southern railroads for the handling of various commodities in boxcars consigned to ports in those territories.

Car Service Order 871, applying generally to all ports in the country, was issued by I.C.C. effective 15 December 1950 (15 F.R. 8995, as corrected, 15 F.R. 9066) and was extended by various amendments until August, 1953. It provided:

> "Free Time on Unloading Box
> Cars at Ports
>
> \*     \*     \*     \*     \*     \*
>
> "*It appearing,* that there is a critical shortage of box cars, that box cars are being delayed unduly in unloading at ports and that free time published in tariffs for unloading such cars aggravates the shortage; impeding the use, control, supply, movement, distribution, exchange, interchange and return of such cars; in the opinion of the Commission an emergency exists at all ports of the country requiring immediate action to promote the National Defense and car service in the interest of the public and the commerce of the people: It is ordered, that:
>
> "§ 95.871 *Free time on unloading box cars at ports.* (a) No common carrier or carriers by railroad subject to the Interstate Commerce Act shall allow, grant or permit more than a combined total of 7 days free time on any box car held for unloading at the point of transfer from car to vessel or storage or when held short of such transfer point."

Paragraph (b)(1) of Order 871 provided that in computing the seven days free time all Saturdays, Sundays, and the certain holidays listed in Item 7 of Agent Jones' Demurrage Tariff 4–Z, I.C.C.No. 4257, should be excluded. Paragraph (b) (3) provided that any detention beyond the seventh day "shall not be offset by credits earned under any average detention basis for settlement", referring to a practice used by railroads in computing demurrage charges on a per car basis.

Paragraph (e) suspended all rules and regulations in conflict with the order and required each railroad to publish a supplement to each of its tariffs affected thereby.

Car Service Order 871 was originally issued as an emergency order under 49 U.S.C.A. § 1(15), which provides for emergency orders dealing with "car service", as defined in 49 U.S.C.A. § 1(10), but does not provide for emergency orders dealing with storage charges.

Along with Car Service Order 871, I.C.C. issued Car Service Order 870, 15 F.R. 8994, 9066, which dealt in almost identical language with free time allowed on freight cars loaded at ports. The evident purpose of both orders was to expedite the movement of cars by increasing demurrage charges.

Car Service Order 871 did not specifically provide for the abrogation of the grain storage tariff nor for the application of demurrage to such shipments. It said nothing about Item 10 of the demurrage tariff, quoted above, which exempts grain at ports from demurrage rules and charges. Nevertheless, the railroads considered the order to be ambiguous, and on 15 December 1950, the Executive Assistant to the Chairman of the Car Service Division of the Association of American Railroads discussed the order with Charles W. Taylor, an employee of the Bureau of Service of I.C.C., who later became Director of that bureau. Taylor expressed the informal opinion that it was the intention of the order to reduce free time on grain to seven days, with storage charges starting on the eighth day. This opinion was communicated to the railroads, which undertook to make such charges, although they

were resisted in most instances. Many cases similar to the case at bar are said to be pending.

 . Although even an informal opinion of an experienced I.C.C. official must carry some weight, it cannot overcome the plain language of the orders and tariffs.

■ Car Service Order 871, by its explicit terms, is concerned with demurrage charges on cars and not with storage charges for grain. There is nothing in the order to indicate that the I.C.C. intended to change the storage tariffs. The purpose of the order was to expedite the movement of cars. In a situation like that at the Port Covington elevator, where the shipper had no control over the unloading, the only result of a reduction in free time would have been extra payments to railroads by shippers. Since the railroad itself was in full control of the unloading, this might have discouraged speed on the part of the railroad, and so worked contrary to the purpose of the order. Demurrage charges are intended to serve two purposes: to encourage shippers to release equipment expeditiously, and to compensate the railroads for the loss of use of such equipment.

Plaintiff conceded at the hearing on the pending motion that it had issued embargo permits for all of the shipments involved in this case, and stated that the delay in unloading the cars was caused by the congestion at Port Covington, which prevented plaintiff from promptly unloading the cars, without "fault" on the part of plaintiff, as it claims, but admittedly without "fault" on the part of C.C.C. If there was any fault or negligence on the part of plaintiff, that might be an additional defense to C.C.C. in this case, as noted above; but even if there was no negligence on the part of plaintiff, it would be an arbitrary order which imposed penalties on C.C.C., the shipper, when the railroad was in charge of the unloading, and not the shipper or any agent of the shipper. See Iversen v. United States, D.C., 63 F.Supp. 1001, 1006, affirmed 327 U.S. 767, 66 S.Ct.

825, 90 L.Ed. 998, rehearing denied 327 U.S. 819, 66 S.Ct. 963, 90 L.Ed. 1041.

In Pennsylvania Railroad Co. v. Commodity Credit Corporation, No. 3583–54 Civil, in the District Court for the District of Columbia, unreported, a case similar to the one at bar, Judge Morris found that "the detention of the box cars was caused by plaintiff's failure promptly to unload the box cars in accordance with its duty", and held that the charges "did not accrue under the provisions of Corrected Service Order No. 871 or under any of the tariffs filed by plaintiff at the Interstate Commerce Commission and further that Corrected Service Order No. 871 is not applicable * * * *".

■ I conclude that Car Service Order 871 related to demurrage charges for detention of rolling stock, not to storage charges for grain; that it did not modify plaintiff's Tariff 8942; and that plaintiff is not entitled to recover the additional storage charges claimed in this case.

Judgment for the defendant with costs.