**READING COMPANY, Plaintiff,**

v.

**COMMODITY CREDIT CORPORATION, Defendant.**

**Civ. A. No. 20312.**

United States District Court
E. D. Pennsylvania.

Feb. 13, 1958.

---

Edward Greeh (of White, Williams & Scott), Philadelphia, Pa., for plaintiff.

Harold K. Wood, U. S. Atty., Alan J. Swotes, Asst. U. S. Atty., Philadelphia, Pa., for defendant.

GRIM, District Judge.

Plaintiff railroad company has brought this action to recover charges for storage, in railroad cars, of grain shipped by defendant to the railroad's Port Richmond elevators in Philadelphia for transfer to ships and shipment overseas. The grain remained in the cars for periods ranging from 10 to 64 days. It remained in the cars because the elevators were full, as defendant knew when it shipped the grain, and because ships were not available into which the grain could be transferred. It was the railroad's responsibility to unload the grain from the cars and load it into the ships. It was defendant's responsibility to provide the ships to receive the grain. The railroad was entitled to withhold permits for the shipment of the grain to Port Richmond, but granted them despite its

knowledge of crowded conditions at the elevators there.[1]

The only charges involved here are those claimed for the 8th to the 20th day of storage, defendant having paid for all storage thereafter. Contending that no charges were due until after the 20th day, defendant has moved for summary judgment in its favor.

The problem involves tariffs filed with the Interstate Commerce Commission. The only tariff of this railroad applicable to grain consigned to the Port Richmond elevators was its Tariff No. 90–A, I.C.C. No. 2351, Rule 260, "Subject: Elevator and other charges on * * * grain * * * in Port Richmond elevator, Philadelphia, Pa." The tariff provided, among other things:

"Item 1205–A * * * The Grain * * * will be held in cars * * * without charge for storage for 20 days * * *

"Item 1215–A At the expiration of said 20 days, the Grain * * * will be subject to the same storage rules as are applicable when stored in Elevator at Port Richmond, Pa. * * * *"[2]

This action arises out of the possible effect on the tariff of an order of the Interstate Commerce Commission,[3] as follows:

"It appearing that there is a critical shortage of box and refrigerator cars, that such cars are being delayed unduly in unloading at ports and that free time published in tariffs for unloading such cars aggravates the shortage; impeding the use, control, supply, movement, distribution, exchange, interchange and return of such cars; in the opin-ion of the Commission an emergency exists at all ports of the country requiring immediate action to promote car service in the interest of the public and the commerce of the people. It is ordered, that:

"Section 95.905. Free time on unloading box and refrigerator cars at ports. (a) (1) No common carrier or carriers by railroad subject to the Interstate Commerce Act shall allow, grant or permit more than a combined total of 7 days free time on any box or refrigerator car held for unloading at the point of transfer from car to vessel or storage or when held short of such transfer point * * * *"

Plaintiff contends that this part of Service Order 905 reduces the free time for the storage of grain in railroad cars at Port Richmond from twenty days to seven. In my opinion this contention is valid. It is clear from the preamble that when the Order was issued there was a critical shortage of railroad cars, resulting to some degree from delays in unloading at ports and the free time which tariffs allowed for unloading. Because of this critical shortage, constituting an emergency, the Order sought to reduce the shortage and so keep railroad cars moving. The method adopted was to provide that no railroad should grant more than seven days' free time for unloading cars at ports. Prior to this Order there was no pressure on shippers and consignees, such as the present defendant, to bestir themselves to make ships available at ports until twenty days after their goods had arrived there, because those twenty days cost them nothing for either storage or demurrage. By Service Order 905 the Commission

---

1. The facts are stipulated only for the purpose of defendant's motion for summary judgment.

2. Item 1195 of the tariff provides that "Demurrage rules and charges will not be applicable on shipments of bulk Grain * * * for the Port Richmond Elevator * * * ." Demurrage is charged for on a per-car-per-day basis, whereas the charge for grain storage is per-bushel-per-day. There is no difference in storage charges whether the grain was in cars or in elevators.

3. Service Order 905, Part 95–Car Service, Free Time on Unloading Box and Refrigerator Cars at Ports, 20 Fed.Reg. 5131 (1955).

obviously intended to stimulate shippers such as defendant to provide ships more promptly by exerting on those shippers the economic pressure of an earlier starting date for charges for railroad cars that awaited unloading at ports. The purpose of Order 905 was reasonable and the Order was well calculated to accomplish its purpose.

The problem of delay in unloading railroad cars at ports may have been more acute in connection with grain than with other freight. Since the tariff had specifically mentioned that grain could be stored free at Port Richmond for twenty days, Order 905 might have made specific reference to grain, but the fact that the order was phrased only in general terms is no ground for saying that grain was not included in the order along with other freight.

Defendant contends that Order 905 could not move cars faster because it was the railroad's obligation to unload the cars, and that no amount of diligence on the part of the shipper-consignee in making ships available would move cars if the railroads failed to unload them. Defendant contends that to begin railroad revenues for the use of loaded cars only seven days after arrival would merely be an inducement to the railroads to dawdle with the unloading, and so be paid for their own delay. It is not for me to inquire into the wisdom of orders of the Interstate Commerce Commission and I cannot know what terms are included in all the contracts between railroads and consignee at ports, but the situation in the present case probably is typical. While it was the railroad's obligation in the present case to unload, its control over the unloading was not unlimited. Certainly it was part of defendant's express or implied contract with plaintiff railroad that the railroad would unload the cars at the port with all reasonable speed. If, because of a lack of diligence or a deliberate attempt to run up storage charges for grain standing in cars, the railroad should fail to unload within a reasonable time, there would be contractual sanctions which defendant could apply against the railroad. In view of this, therefore, the Order would certainly act as a lever to get these stalled cars moving.

Defendant contends that Order 905 applies only to demurrage charges. Demurrage is a penalty imposed for delay in unloading railroad cars after arrival, or compensation to railroads for the use of cars not unloaded promptly. Demurrage is charged by the car, while grain storage is charged by the bushel. Whatever the nature or purpose of the charge, since it is a cost to consignee, the effect is to stimulate consignees to keep railroad cars moving and to make the cars available for new uses after they have completed a haul. This is exactly the Commission's purpose in reducing the amount of free time in Order 905. Item 1195 of plaintiff's tariff provides that "Demurrage rules and charges will not be applicable on shipments of bulk Grain * * * for the Port Richmond Elevator." Whether by a change in demurrage rules or by a change in storage rules, the result of Order 905 was the same—to make railroad cars available for other uses more quickly after the completion of hauls.

Defendant contends also that Order 905 should apply only to situations where the consignee has full control over the unloading. Had the Commission intended to restrict its order to such situations it could easily have inserted such a restriction, but no such restriction appears. It must be remembered, too, that because of their contract rights consignees have a considerable measure of control over unloading in any case.

Defendant cites Western Maryland Railway Co. v. Commodity Credit Corp., D.C.M.D.1957, 154 F.Supp. 508 to support its contention that Service Order 905 did not reduce the free time allowed by storage tariffs for grain-carrying railroad cars awaiting unloading at ports. The Western Maryland case concerned Order 871, dated 1950, and not Order 905, dated 1955. While the two orders are quite similar, Order 905 contains a paragraph, not included in Order

871, which makes its meaning clearer. After mentioning the critical shortage of railroad cars, the emergency existing at ports, and the reduction of free time to seven days, Order 905 provides (in Section 95.905(a) (2)) that, where railroads enter into agreements with the United States [4] providing for waiver of storage charges where shipments are held for transfer to ships, railroads must unload and release the cars for transportation service within 24 hours after the end of the seven-day period. Reading it as a whole, Order 905 clearly means that the free time allowed for the storage of goods in railroad cars at ports is reduced to seven days. Railroads can enter into agreements with the United States as a shipper or consignee under which the railroads waive their right to charge storage after seven days, but if such an agreement is entered into, the railroads must unload and release the cars for transportation service within 24 hours after the expiration of the seven-day period.[5] This reference to agreements between the United States as a consignee and railroads waiving storage charges after seven days, indicates strongly that the purpose of the order was to reduce free time for storage to seven days. Because Order 871 did not contain the paragraph relating to waiver agreements, the Western Maryland case is distinguishable from the present case. Because, in addition, I disagree with some of the reasoning in the opinion,[6] the Western Maryland case will not be followed.

Defendant's motion for summary judgment is denied.

4. Under Section 22 of the Interstate Commerce Act, 49 U.S.C.A. § 22.

5. This section of the Order might present difficult problems if, without anyone's fault, no ships or storage facilities were available at ports at the end of seven days.

6. The opinion states (at page 511): "* * * The only result of a reduction in free time would have been extra payments to railroads by shippers." With this statement I disagree.

The opinion states (at page 510): "* * * 49 U.S.C.A. § 1(15) * * * does not provide for emergency orders dealing with storage charges." Section 1(15), however, taken with Section 1(10) does provide for the issuance of emergency orders dealing with storage charges to the extent that such charges apply to railroad cars, affecting their "use, control, supply, movement, distribution, exchange, interchange, [or] return."