**READING COMPANY**

v.

**COMMODITY CREDIT CORPORATION, Appellant.**

**No. 13292.**

United States Court of Appeals Third Circuit.

Argued Jan. 24, 1961.

Decided April 25, 1961.

**3.** Yates v. Looney, 10 Cir., 250 F.2d 956; Taylor v. Daniels, 10 Cir., 284 F.2d 135; Wooten v. Wilkinson, 5 Cir., 265 F.2d 211; 18 U.S.C.A. § 4207.

Howard E. Shapiro, Washington, D. C. (George Cochran Doub, Asst. Atty. Gen., Geo. S. Leonard, Acting Asst. Atty. Gen., Walter E. Alessandroni, U. S. Atty., Philadelphia, Pa., Alan S. Rosenthal, Atty., Dept. of Justice, Washington, D. C., on the brief), for appellant.

Jan E. DuBois, Philadelphia, Pa. (White & Williams, Philadelphia, Pa., on the brief), for appellee.

Before BIGGS, Chief Judge, and McLAUGHLIN and KALODNER, Circuit Judges.

BIGGS, Chief Judge.

This is an appeal from an order of the court below granting summary judgment in favor of the plaintiff, Reading Company, in its action to recover $2,628.-12 in charges for the storage of grain owned by the defendant, Commodity Credit Corporation. Two questions are presented.

First, does Interstate Commerce Service Order 905, which limits to 7 days the free time which may be allowed by rail carriers on cars held for unloading, apply where the shipper has no control whatsoever over unloading but has the sole responsibility to provide ships into which the contents of the cars may be unloaded? Inherent in the judgment appealed from is the legal fact that the answer given to this question by the court below, by way of a decision, referred to hereinafter, denying Commodity's motion for a summary judgment, was in the affirmative. We are of the view that we may pass upon the correctness of the answer given by the court below to this first question since otherwise final judgment could not have been given for Reading as it was.

After the court below had entered an order denying Commodity's motion for summary judgment, based on the ground indicated, Reading moved for summary judgment. Commodity set up as an "Opposition", Rule 8 of I.C.C. 4610, Freight Tariff 4-B, asserting that Reading was not entitled to the amount of storage charges claimed since it had failed to unload the cars in the order of their arrival. To this opposition Reading interposed the provisions of Section 2(b) of the Uniform Commercial Bill of Lading which provided that a claim for delay must be made within 9 months after delivery at a port of export. The court ruled in favor of Reading and gave judgment on the ground interposed by Reading in the amount stated in the first paragraph of this opinion. Thereby was posed the second question for our decision, which may be stated as follows: does Section 2(b) of the Uniform Commercial Bill of Lading bar Commodity's defense because it did not file a claim within the 9 months period?

The facts are stipulated.[1] Between August and November 1955, Commodity, desiring to ship a quantity of grain overseas, ordered cars from Reading for shipment of the grain to Reading's Port Richmond elevator in Philadelphia. The grain arrived at various times in August and November and remained in the cars for periods ranging from 10 to 65 days. During this period there was an embargo on the shipment of grain to eastern ports, and no grain was accepted at the Port Richmond elevator unless, prior to its shipment, a permit had been obtained

1. The parties on separate occasions and for the two separate motions stipulated two separate sets of facts in the court below. The first set of facts was presented in a light most favorable to the plaintiff and was designed to be considered only on defendant's motion for summary judgment. Subsequent to the denial of defendant's motion a second set of facts was submitted only for purposes of the plaintiff's motion for summary judgment. The plaintiff's motion was granted.

Each motion for summary judgment presented a wholly separate question of law for the court's determination. On this appeal, however, we will consider both of these issues on a single set of facts. Preliminarily, therefore, we must determine whether one or the other or both of the stipulations govern on this appeal.

Although each stipulation contains some facts that the other does not, fortunately the stipulations are not inconsistent with one another in any particular. Moreover, both of the parties have used both stipulations interchangeably in their briefs in this court in arguing both questions. We conclude, therefore, that all of the facts contained in both stipulations properly may and indeed must be deemed to constitute the record on this appeal.

from Reading.[2] All of the grain shipped to Port Richmond by Commodity was shipped subject to permits issued by Reading despite the fact that Reading had knowledge of the crowded conditions of its grain elevators.

Reading had complete control of the unloading of the grain which arrived at its Port Richmond elevator from the cars into the elevator and the vessels which were to take the grain overseas. Neither Commodity nor any other shipper had any control whatsoever over such unloading; nor could a shipper take any action which would compel Reading to unload cars. Commodity, however, had the responsibility for providing vessels to receive the grain. Despite its knowledge of the crowded conditions at Reading's elevator, Commodity continued to order cars and failed to provide vessels into which the grain from the cars or elevator could be unloaded.

Eventually Reading unloaded the grain into its elevator. It did not, however, unload the cars in the order of their arrival at Port Richmond. If Reading had unloaded the cars in which Commodity's grain was stored in the order of their arrival, Reading's claims against Commodity would have been substantially reduced even assuming Car Service Order 905 to be applicable.

During the periods in question Tariff No. 90-A, I.C.C. No. 2351, Rule 260, was applicable. That tariff provided that grain not unloaded into the Port Richmond elevator would be held in cars at

that point without charge for storage for 20 days. In addition, it provided that grain placed in the elevator prior to the expiration of the free storage periods would be entitled to the balance of the free period in the elevator. Reading's claim was based on I.C.C. Car Service Order 905, 20 F.R. 5131 (1955) which forbade carriers to allow more than 7 days free time on any box car held for unloading at ports.[3] Reading asserted that it had undercharged Commodity insofar as it had not submitted bills for storage charges covering periods in excess of 7 days during which the cars loaded with Commodity's grain remained at Port Richmond. It is conceded that if Car Service Order 905 did not modify Tariff 90-A, Reading is not entitled to recover the additional charges it claims in this case.

On February 12, 1957 Commodity moved for summary judgment primarily on the ground that "Service Order No. 905 was intended to apply only to those shippers who were in control of the unloading of box cars or were in a position to influence the time of such unloading, and was not intended to apply to shippers who had no control or influence over the times of unloading of box cars." Reliance was placed on Western Maryland Ry. Co. v. Commodity Credit Corp., D.C.D.Md.1957, 154 F. Supp. 508 which held that Car Service Order No. 871, an Order similar to Order 905, applied only to situations where the shipper was in control of unloading and was liable for demurrage charges.[4] The

**2.** Such permits were issued orally and merely permitted the shipment to the elevator of a specific kind and quantity of grain during a stated period. No permit was issued on the condition that the grain shipped should be removed from the Port Richmond elevator.

**3.** Car Service 905, section 95.905 in pertinent part provides: "Free time on unloading box and refrigerator cars at ports. (a) (1) No common carrier or carriers by railroad subject to the Interstate Commerce Act shall allow, grant or permit more than a combined total of 7 days free time on any box or refrigerator car held for unloading at the

point of transfer from car to vessel or storage or when held short of such transfer point. The provisions of this paragraph shall not be construed to require or permit the increase of any free time published in tariffs lawfully on file with this Commission, and in effect on the effective date of this section."

**4.** The stipulation entered into upon Commodity's motion provides that demurrage rules and charges are not applicable to the shipments and that no demurrage charges are claimed in the action.

The stipulation entered into upon Reading's motion for summary judgment pro-

court below denied Commodity's motion, 1958, 159 F.Supp. 67. In answer to Commodity's argument that Car Service Order 905 was intended to apply only in the case of shippers who were in a position to expedite the unloading of cars, and its assertion that it was not such a shipper, the court said: "Prior to this Order there was no pressure on shippers and consignees, such as the present defendant, to bestir themselves to make ships available at ports until twenty days after their goods had arrived there, because these twenty days cost them nothing for either storage or demurrage. By Service Order 905 the Commission obviously intended to stimulate shippers such as defendant to provide ships more promptly by exerting on those shippers the economic pressure of an earlier starting date for charges for railroad cars that awaited unloading at ports. The purpose of Order 905 was reasonable and the Order was well calculated to accomplish its purpose." 159 F.Supp. at pages 69–70.

. ██ We conclude that the court below was correct in holding that, on the facts of this case, Car Service Order 905 reduced the free storage time allowed Commodity by Reading's Tariff 90-A from 20 to 7 days. Commodity's contention that Order 905 is applicable only to demurrage charges is untenable. Order 905, section 95.905 does not, by its terms, distinguish between storage and demurrage charges. It states only that no carrier "shall allow, grant or permit more than a combined total of 7 days free time on any box or refrigerator car held for unloading. * * *" Commodity's argument that storage free time is not affected is based on the purpose of the Order as set out in its preamble which is as follows: "It appearing that there is a critical shortage of box and refrigerator cars, that such cars are being. delayed unduly in unloading at ports and that free time published in tariffs

for unloading such cars aggravates the shortage; impeding the use, supply, movement, distribution, exchange, interchange and return of such cars; in the opinion of the Commission an emergency exists at all ports of the country requiring immediate action to promote car service in the interest of the public and the commerce of the people." Similarly, Commodity points out, "The purpose of demurrage charges is to promote car efficiency by penalizing undue detention of cars." Pennsylvania R. R. Co. v. Kittanning Iron & Steel Mfg. Co., 1920, 253 U.S. 319, 323, 40 S.Ct. 532, 533, 64 L.Ed. 928. Therefore, it is argued, there is an obvious relationship between demurrage charges and the reduction in free time required by Order 905.

It is certainly true that demurrage charges and Order 905 have a similar purpose and an obvious relationship insofar as both seek to discourage a shipper from detaining a car for an undesirably long period of time. It is also true, however, that storage charges can, in many cases, promote car efficiency by discouraging undue detention of cars. As Mr. Justice Brandeis stated in Turner, Dennis & Lowry Lumber Co. v. Chicago, M. & St. P. Ry. Co., 1926, 271 U.S. 259, 46 S.Ct. 530, 531, 70 L.Ed. 934, "One cause of undue detention is lack of promptness in loading at the point of origin or in unloading at the point of destination. Another cause is diversion of the car from its primary use as an instrument of transportation by employing it as a place of storage, either at destination or at reconsignment points, for a long period while seeking a market for the goods stored therein." If Order 905 were held to apply only to demurrage charges it would not have the effect of expediting the release of cars utilized by shippers for storage purposes. Thus, the Order would less efficiently accomplish its purpose of alleviating the critical shortage of box and refrigerator cars.

vides that Item 1195 of Tariff 90-A states that "Demurrage rules and charges will not be applicable on shipments

on bulk Grain * * * for the Port Richmond elevator * * *."

Commodity argues, however, that even if free storage time is reduced by Order 905, that Order was not intended to apply to shippers who, like Commodity, had no control whatsoever of unloading since in such a situation the Order's application could not stimulate the shipper to expedite the freeing of cars. We recognize that there is precedent for the flexible approach to the construction of Car Service Orders that is presupposed by this argument. See, e. g., Iversen v. United States, D.C.D.C., 63 F.Supp. 1001, 1006, affirmed per curiam, 1946, 327 U.S. 767, 66 S.Ct. 825, 90 L.Ed. 998; Charleston Tidewater Terminals, Inc. v. Atlantic Coast Line R. R., 284 I.C.C. 717 (1952). We also recognize, however, that a court should not construe an administrative order which is applicable on its face to be inapplicable in a given situation by reason of its not fulfilling its purpose unless it is clearly demonstrated that its application would be entirely without purpose. Were a less stringent standard adopted a court often would be compelled to make difficult judgments in a highly technical and specialized area where such judgments have been committed by Congress at least primarily, to the discretion of an expert administrative agency. In accordance with these principles, and even assuming *arguendo* that Car Service Order 905 was not intended to apply to shippers who had no control or influence over the time of unloading of cars, we are of the opinion that it was intended to apply in the present case for the reason that Commodity had available to it a course of action that could reasonably have been expected to have influenced the time of unloading of the box cars in which its grain was stored.

While Commodity had no control whatsoever of the unloading of the cars it did have the sole responsibility of providing the ships into which the grain was to be loaded. Had Commodity known that it would not get 20 days free storage time it might have provided these ships sooner than it did. Alternatively if it had known that only 7 days free storage time was available, Commodity might have coordinated its order of cars from Reading with the arrival time of the ships so as to reduce the time that the cars were diverted for storage purposes. It is true that even if Commodity had provided the ships earlier than it did or had better coordinated the arrival of the ships and the cars, Reading might not have unloaded the cars within the 7 days.[5] Had Commodity provided ships within 7 days after the arrival of the cars, and had Reading then failed to unload the cars within the 7 days we would have a situation where it would indeed be difficult to see how the application of Order 905 would advance its plain purpose. But, that is not the case and we need not decide here whether Order 905 would be applicable in such a situation. The point is that Commodity could have taken a course of action that could reasonably have been expected to expedite the freeing of box cars. It was the purpose of Order 905 to stimulate such action.

Commodity points out that all grain shipped to Port Richmond was shipped subject to permits issued by Reading and that Reading could have refused permits on the ground that its yard was congested, preventing cars from being unloaded expeditiously. From this it is argued that the place to control traffic was exclusively in the office of Reading. It may be true that Reading was in a better position than Commodity to avert the undue detention of cars at Port Richmond, but the fact remains that Commodity, while having knowledge of the crowded conditions at Reading's

5. The Superintendent of the Port Richmond elevator, however, stated in a sworn affidavit accompanying Reading's motion for summary judgment that grain needed for loading aboard ships was unloaded ahead of grain held for storage.

If this statement is correct, and it has not been challenged on this appeal, it indicates that had Commodity supplied ships sooner, its grain would have been unloaded more promptly.

elevators, did not take all of the steps it reasonably could have taken to reduce the time that the cars loaded with its grain were diverted from use in interstate transportation. Order 905 is designed to coerce shippers, not carriers, and, therefore, the fact that a carrier is more responsible for the detention of cars in a given situation than is the shipper is not critical so long as the shipper had the power to take some step that could reasonably be expected to expedite the unloading of cars.

On April 24, 1958, after the court below denied Commodity's motion for summary judgment, Reading moved for summary judgment in the amount of its alleged undercharges. Commodity opposed this motion on the ground that "the delays in unloading the cars were, in substantial part, within the exceptions in [Rule 8 of I.C.C. 4610, Freight Tariff 4-B] naming Car Demurrage Rules and Charges, which was specifically made applicable to any charges claimed under the Service Order. * * * These delays occurred as the result of the failure of the plaintiff, which has exclusive control of unloading, to unload the cars in order of their arrival. Section E [of the Tariff] relieves defendant of charges for such delays." The court nevertheless granted Reading's motion reasoning that Commodity's defense was a "claim" for damages due to delay which was barred because Commodity did not file its "claim" in writing with the carrier within 9 months as required by Section 2(b) of the Uniform Commercial Bill of Lading which governed the shipments. 181 F.Supp. 359.[6] It is from this judgment that Commodity appeals.

■ This disposition was erroneous. Reading asserted a claim for storage charges based on certain tariff provisions. It contended that Commodity had a contractual duty to pay these charges. As we understand Commodity's defense, it was that since its grain was stored in box cars solely because of Reading's failure to unload the cars in the order of their arrival no storage charges were collectible under the applicable tariff. In short, Commodity asserted that Reading's original bills were correct since, as a matter of tariff construction, it was not entitled to further storage charges. Commodity could not have been expected to make this assertion in writing within 9 months after the delay in the light of Reading's original billings. Such an assertion by way of defense, therefore, can in no sense be deemed a "claim" within the meaning of Section 2(b).

We, therefore, will reverse the judgment and remand the case. The court below must proceed to redetermine Reading's motion for summary judgment in the light of what we have said. If the court below should deny Reading's motion—and as to its merit we, of course, express no opinion—the court shall proceed with the case as the facts and the law require.

6. Section 2(b) of the Uniform Commercial Bill of Lading provides: "As a condition precedent to recovery, claims must be filed in writing with the receiving or delivering carrier, or carrier issuing this bill of lading, or carrier on whose line the loss, damage, injury or delay occurred, within nine months after delivery of the property (or, in case of export traffic, within nine months after delivery at port of export) or, in case of failure to make delivery, then within nine months after a reasonable time for delivery has elapsed; and suit shall be instituted against any carrier only within two years and one day from the day when notice in writing is given by the carrier to the claimant that the carrier has disallowed the claim or any part or parts thereof specified in the notice. Where claims are not filed or suits are not instituted in accordance with the foregoing provisions, no carrier hereunder shall be liable, and such claims will not be paid."