**WESTERN MARYLAND RAILWAY COMPANY, Plaintiff,**

v.

**CONTINENTAL GRAIN COMPANY et al., Defendants.**

United States District Court
S. D. New York.
June 26, 1963.

Kirlin, Campbell & Keating, New York City, for plaintiff.

Weidenbaum, Bank & Teicher, New York City, for defendants Sinason Teicher and Inter. Am. Grain.

Graubard & Moskovitz, New York City, for defendant Bunge.

Buchter, Ratheim, Abrams & Hoffman, New York City, for Leval & Garnac.

Charles A. Gutwirth, New York City, for Continental Grain.

EDELSTEIN, District Judge.

This action was commenced by the plaintiff, Western Maryland Railway Co., against eleven defendants to collect

storage and detention charges allegedly due and owing. Defendant Bunge Corporation, named as defendant in the third count of the complaint, now moves for summary judgment under Rule 56, Fed.R.Civ.P. Counsel have agreed that there is no genuine issue of material fact. And indeed after an independent examination of the moving papers the court finds that resort to the summary judgment procedure is appropriate as sole question for adjudication is one of law, namely, the legal effect and enforceability of an agreement between the parties to have their tariff dispute be governed by the outcome of another adjudication. Cf. Empire Electronics Co. v. United States, 311 F.2d 175 (2d Cir. 1962); see Madeirense Do Brasil, S/A v. Stulman-Emrick Lumber Co., 147 F.2d 399 (2d Cir. 1945).

The plaintiff railroad, hereafter referred to as a carrier, is a common carrier in interstate commerce and is subject to the Interstate Commerce Act. The defendants, hereafter called shippers, are engaged in buying, selling and exporting grain. In the course of their respective businesses defendants shipped various box cars of grain to the plaintiff's grain elevator at Port Covington, Baltimore, Maryland, for shipment abroad.

In 1950 the Interstate Commerce Commission promulgated Service Order 871, effective December 15, 1950, 15 Fed.Reg. 8995, as corrected, 15 Fed.Reg. 9066, which was extended by various amendments until August 1953. It provided that:

> "IT APPEARING, That there is a critical shortage of box cars, that box cars are being delayed unduly in unloading at ports and that free time published in tariffs for unloading such cars aggravates the shortage; impeding the use, control, supply, movement, distribution, exchange, interchange and return of such cars; in the opinion of the Commission an emergency exists at all ports of the country requiring immediate action to promote the National Defense and car service in the interest

of the public and the commerce of the people.

> "IT IS ORDERED, That:
> "§ 95.871 FREE TIME ON UN-LOADING BOX CARS AT PORTS.
> "(a) No common carrier or carriers by railroad subject to the Interstate Commerce Act shall allow, grant, or permit more than a combined total of 7 days free time on any box car held for unloading at the point of transfer from car to vessel or storage or when held short of such transfer point. The provisions of this paragraph shall not be construed to require or permit the increase of any free time published in tariffs lawfully on file with this Commission, and in effect on the effective date of this order * * *
> "(e) REGULATIONS SUSPEND-ED—ANNOUNCEMENT REQUIRED.
> "The operation of all rules and regulations insofar as they conflict with the provisions of this order is hereby suspended and each railroad subject to this order, or its agent, shall publish, file, and post a supplement to each of its tariffs affected hereby, in substantial accordance with the provisions of Rule 9(k) of the Commission's Tariff Circular No. 20 (§ 141.9(k)) of this Chapter, announcing such suspension."

At the time of the promulgation of the 1950 order there were storage charges in effect whereby the plaintiff, in its capacity as a warehouseman, assessed storage charges on a per bushel per day basis against grain awaiting shipment from Port Covington. The plaintiff's tariff of storage charges granted the grain shippers twenty days free storage time at Port Covington, irrespective of whether the grain was held in the railroad cars or stored in plaintiff's elevator. Accordingly, the storage charges did not begin to accrue until the expiration of the twenty day period. And by virtue of the applicability of these grain storage tariffs to shippers, the grain shippers were exempted by another provision of

128

the I.C.C. Regulations from paying demurrage charges. Demurrage charges are not charges for the storage of goods but are assessed for the detention of rolling stock on a per car per day basis.[1]

The issuance of the 1950 order limiting "free time" to seven days gave rise to considerable question and controversy within the industry concerning its intended scope and validity. The grain shippers, in general, claimed that the 7 day free time limitation of Order 871 was intended to deal only with demurrage tariffs and not with tariffs fixing commodity storage charges on a per bushel per day basis. Acceptance of the grain shipper's interpretation would render the Order inapplicable to the shippers since under the exception of the I.C.C. regulation noted above they were not liable for demurrage charges. In addition, the shippers contended that the Order was invalid if it applied to storage charges in cases where the carrier had sole control and responsibility over the unloading of the railroad cars.

The plaintiff claimed that the 7 day free time requirement which Order 871 newly imposed was valid and that therefore Bunge was liable to it for $1,122.95 in storage and detention charges. On March 4, 1954, plaintiff initiated correspondence between itself and the movant, Bunge Corporation, concerning the most expeditious method of settling the dispute between the carrier and the shippers. This correspondence ripened into an agreement between the parties whereby Bunge agreed to be joined in a suit in the Southern District of New York with the other defendants and consented to be served in this District. The plaintiff agreed in a further exchange of letters to hold the suit in the Southern District of New York in abeyance pending the outcome of an action brought by plaintiff against the Commodity Credit Corporation in the United States District Court for the District of Maryland. Plaintiff's suit in the Maryland District Court involved the construction of the 1950 Service Order 871, and involved an adjudication of the identical question which divides plaintiff and defendants.

Some three years later, on September 9, 1957, the Maryland District Court rendered its decision. See Western Maryland Ry. Co. v. Commodity Credit Corp., 154 F.Supp. 508 (D.Md.1957). The court sustained the shippers' contentions that Service Order 871 was not intended to modify storage tariffs allowing twenty days free time but related to demurrage charges on the detention of rolling stock. The court held that the plaintiff was not entitled to recover storage charges beginning on the eighth day after arrival. Plaintiff did not appeal the decision to the Court of Appeals for the Fourth Circuit. Subsequently, in a similar case brought by another carrier against the Commodity Credit Corporation, the Third Circuit reached a contrary conclusion and found Order 871 applicable to demurrage as well as storage charges. See Reading Co. v. Commodity Credit Corp., 289 F.2d 744 (3rd Cir. 1961).[2] Thereupon, the plaintiff notified the defendant that notwithstanding its prior agreement it was constrained to prosecute this action because of the Third Circuit's holding that railroads were entitled to recover storage charges beginning on the eighth day after arrival of the commodity shipment.

1. Item 10 of Car Demurrage Rules and Charges, Freight Traffic No. 4–Z, ICC No. 4257, in effect when Car Service Order 871 became effective, provided:
"The following cars are not subject to Demurrage Rules and Charges, published in Section No. 1, pages 39 to 50, inclusive. * * * (b) At the ports on cars containing freight for transshipment to or from vessels * * *, on cars containing export traffic, when rules and charges applicable thereto are provided in the tariffs of the individual carriers lawfully on file with the Interstate Commerce Commission, except to the extent indicated in such tariffs. This exception also applies to such cars when held in transit because they cannot reasonably be accommodated at the ports."

2. This suit involved Service Order 905, 20 Fed.Reg. 5131, (1955) which is similar in all relevant aspects to Service Order 871.

Defendant's motion for summary judgment is founded on its contention that the agreement between the parties that the Maryland District Court decision would be dispositive of the issues in the instant case, is valid and enforceable and cannot be avoided because a subsequent Third Circuit decision is more in accord with plaintiff's own interpretation of the Service Order.

The plaintiff-carrier, however, contends that the 1954 agreement is not legally enforceable since it would permit a carrier to waive the charges which it is absolutely obligated to collect under the Interstate Commerce Act, 49 U.S.C. § 6 (7).[3] The plaintiff's contention is bottomed on its view that the opinion of the Third Circuit in Reading Co. v. Commodity Credit Corp., supra, correctly interprets the Order. It concludes that until Service Order 871 is invalidated by this Circuit's Court of Appeals or by the Supreme Court its 1954 Agreement is violative of what it deems to be the prevailing authority—the decision of the Third Circuit.

The court has been able to find but a few authorities that deal with the effect of a stipulation to abide the result of another action, but these authorities deal only cursorily with the problem. See, e. g., Prout v. Starr, 188 U.S. 537, 23 S.Ct. 398, 47 L.Ed. 584 (1903); The Carso, 69 F.2d 824 (2d Cir. 1934); The Cockatoo, 61 F.2d 889 (2d Cir. 1932); Lauterbach Bakery Inc. v. C. I. R., 118 F.2d 898 (3d Cir. 1941); United States v. Davison, 1 F.2d 465 (W.D.Pa.1924), aff'd per curiam, United States by Lewellyn v. Davison, 9 F.2d 1022 (3d Cir. 1926), cert. denied, 271 U.S. 670, 46 S.Ct. 484, 70 L. Ed. 1143 (1926); Annot., 161 A.L.R. 1161, 1195–98 (1945); cf. Arcless Contact Co. v. General Electric Co., 87 F.2d 340 (2d Cir. 1937). And no case has been presented by either of the parties involving the question of the enforcement of such an agreement where there exists a conflict between the decision of the agreed upon forum and the subsequent decision of another court. The cases cited by plaintiff are clearly inapposite, as they involve agreements between carriers and shippers to adjust rates between themselves. See Midstate Horticultural Co., Inc. v. Pennsylvania R. R. Co., 320 U.S. 356, 64 S.Ct. 128, 88 L.Ed. 96 (1943); Louisville & N. R. R. v. Central Iron & Coal Co., 265 U.S. 59, 44 S.Ct. 441, 68 L.Ed. 900 (1924); Louisville & N. R. R. v. Maxwell, 237 U.S. 94, 35 S.Ct. 494, 59 L.Ed. 853 (1915); A. J. Phillips Co. v. Grand Trunk Western Ry. Co., 236 U.S. 662, 35 S.Ct. 444, 59 L.Ed. 774 (1915); Bernstein Bros. Pipe & Machinery Co. v. Denver R. G. W. Ry., 193 F.2d 441 (10th Cir. 1951); Pennsylvania R. R. Co. v. Fox & London, Inc., 93 F.2d 669 (2d Cir. 1938); Union Pac. Ry. Co. v. Corneli Seed Co., 161 F.Supp. 52 (D. Idaho 1958); Chicago, B. & Q. R. R. v. Blunk, 101 F.Supp. 219 (S.D.Iowa 1951); Norton v. Shotmeyer, 72 F.Supp. 188 (D.N.J.1947). These agreements *inter se* plainly differ from the stipulation entered into here whereby the parties agreed to be bound by the Maryland District Court decision as to the interpretation of Order 871. Had the parties agreed between themselves that the carrier would not collect the extra charges,

3. This section provides:

"§ 6, par. (7). *Transportation without filing and publishing rates forbidden; rebates; privileges.* No carrier, unless otherwise provided by this chapter, shall engage or participate in the transportation of passengers or property, as defined in this chapter, unless the rates, fares, and charges upon which the same are transported by said carrier have been filed and published in accordance with the provisions of this chapter; nor shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transporation of passengers or property, or for any service in connection therewith, between the points named in such tariffs than the rates, fares, and charges which are specified in the tariff filed and in effect at the time; nor shall any carrier refund or remit in any manner or by any device any portion of the rates, fares, and charges so specified, nor extend to any shipper or person any privileges or facilities in the transportation of passengers or property, except such as are specified in such tariffs."

their agreement would then violate the Act and the position which plaintiff seeks to support would then be tenable. Thus, there is no merit to plaintiff's argument that the agreement contravenes the Interstate Commerce Act, 49 U.S.C. § 6(7).

Furthermore, plaintiff has apparently misconceived the force and effect of the Third Circuit's decision. To be sure, the Third Circuit's decision undoubtedly will be persuasive in future litigation concerning the interpretation of Order 871. But the Third Circuit's contradictory decision is no more conclusive than the decision of the Maryland District Court and in no way affects or impairs the Maryland District Court holding which the parties agreed would govern the outcome of this dispute. Until and unless the Supreme Court or the I.C.C. itself resolve the conflict, the decisions represent contradictory interpretations of the Order which are both arguably correct. Moreover, a final resolution of the conflict in the decision appears unlikely since Service Order 871 has since been set aside by the I.C.C. Service Order 912–A, 21 Fed.Reg. 9907 (1956).

Plaintiff's arguments have failed to persuade the court that this agreement to abide the outcome of the Maryland District Court action, freely entered into between the parties, can now be ignored with impunity because of a conflicting determination of the Third Circuit. Plaintiff could hardly have failed to recognize that a matter of some importance to the industry would reach the courts in suits brought by carriers other than itself. Nevertheless, it took no appeal from the decision of the District Court and thereby lost the opportunity to obtain a reversal, or, failing that, to create a conflict among the circuits which could provide a sound basis for certiorari by the Supreme Court.

Plaintiff's failure to appeal also undermines its contention that it cannot abide by the agreement to settle its claim because the Interstate Commerce Act requires it to litigate all its rate claims against shippers. Apparently, plaintiff did not consider its failure to take an appeal to be violative of the Act because it did not do so. The plaintiff cannot, with consistency, brush aside its failure to litigate the District Court decision to an appellate determination at the same time that plaintiff insists that it is under an absolute duty to prosecute its rate claims to effect.

In any event, plaintiff has not pointed to any statutory or case law authority to support its contention that it is obligated to litigate all rate claims. And if plaintiff was not required by the Interstate Commerce Act to take an appeal in the test case, which apparently it was not, it was not required to shop for a circuit which would disagree with the decision in the test case.

The situation in the instant case appears to be analogous to that presented when parties seek collaterally to attack a judgment rendered in another forum. It is abundantly clear that if the original forum had jurisdiction over both the parties and the subject matter, collateral attack would fail *ab initio* without reference to what the new forum's views might be on the merits of the controversy. See Reed v. Allen, 286 U.S. 191, 52 S.Ct. 532, 76 L.Ed. 1054 (1931); 1A Moore, Federal Practice 4017 et seq. (1962). The agreement between the parties should be given the same effect as a judgment rendered in a case where defendant had consented to be sued in Maryland and had been made a party to the action in the Maryland District Court. Defendant's joinder in the Maryland suit would have foreclosed any attempt by plaintiff to open up in this court the identical issues determined in the Maryland suit.

A statement in United States v. Davison, 1 F.2d 465 (W.D.Pa.1924); aff'd per curiam United States by Lewellyn v. Davison, 3 Cir., 9 F.2d 1022, cert. denied, 271 U.S. 670, 46 S.Ct. 484, 70 L.Ed. 1143 (1926), is particularly appropriate here. Davison was a tax case where a similar agreement was made between officials of the United States and the attorney for a group of stockholders. The test case

involving the taxability of the same dividend as was at issue in Davison was decided adversely to the Government. The court stated:

> "The stipulations may not have been precisely the same, but they involved identically the same legal questions, on precisely the same state of facts. * * * It was greatly to the interest of both parties to that action that a score of cases, involving the same questions of fact and law, should be disposed of by the trial and final adjudication of a single case. This both sides agreed to do. I shall not pass on the question as to whether the government is absolutely precluded by the agreement made. This ought not to be necessary. It is a question of good faith. No one, not even a sovereign nation, should be permitted to gamble on the result of a judgment, and then repudiate the result·when the judgment is adverse." Id. 1 F.2d at 470.

Moreover, agreements of the type under review should, if otherwise valid and not contrary to any specific statutory provision, be encouraged. The Federal Rules of Civil Procedure contain many provisions which seek to implement the policy of discouraging multiplicity of litigation and circuity of action. See e. g. Rule 13(a) and (b), (compulsory and permissive counterclaims); Rule 14 (third party practice); Rules 19 and 20 (necessary and permissive joinder); Rule 23 (class actions); Rule 42(a) (consolidation). In fact, one of the hallmarks of the Rules in particular, and of Federal Practice, in general, is the advance made toward the expeditious disposition of multiple claims. The refusal to enforce agreements which would promote this salutary practice would be a step backward and would be incompatible with the policy of the Rules. The plaintiff has failed to sustain its burden of showing why the 1954 agreement should not be enforced. The defendants' motion for summary judgment as to the third count of the complaint is hereby granted. So ordered.