487 F.2d 1263
 CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, a corporation, Appellee,
v.
READY MIXED CONCRETE CO., a wholly owned subsidiary of
Lyman-Richey Sand & Gravel Corporation, Appellant.
 No. 73-1228.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 16, 1973.
Decided Dec. 3, 1973.
 
 William T. Oakes, Omaha, Neb., for appellant.
 Harry B. Otis, Omaha, Neb., for appellee.
 Before HEANEY, ROSS and STEPHENSON, Circuit Judges.
 ROSS, Circuit Judge.
 
 
 1
 Chicago, Burlington and Quincy Railroad Company (hereinafter CBQ) brought this action against Ready Mixed Concrete Co. (hereinafter Concrete Co.) for unpaid switching charges pursuant to a tariff which had been approved by the Interstate Commerce Commission (hereinafter ICC). The switching charges in question were for the period of April, 1965, to November, 1966. The total switching charges pursuant to the tariff amounted to $21,467.91. The sum of $9,226.23 was paid to CBQ by the Concrete Co. on February 2, 1967,[1] pursuant to an agreement between CBQ and the Concrete Co. whereby CBQ agreed to accept that sum as payment in full of switching charges accruing prior to the date of settlement.
 
 
 2
 As a part of the settlement the Concrete Co. agreed to support a change in the tariff by the ICC calling for an increase of five cents per ton of material hauled, and CBQ agreed that as of the effective date of the new tariff the switching cost would be reduced to $5.77 per car. CBQ agreed to petition the ICC for permission to waive switching charges over and above $5.77 per car for the period prior to the effective date of the new tariff.[2] The revised tariff was approved by the ICC with an effective date of November 16, 1966.
 
 
 3
 For the period subsequent to November 16, 1966, the Concrete Co. paid switching charges of $5.77 per car and the increased hauling charge of five cents per ton. The only period with which we are concerned in this lawsuit is the period prior to the effective date of the change in tariff, November 16, 1966. Concrete Co. argues that the switching charges in excess of the $5.77 per car for the period prior to November 16, 1966, were cancelled in exchange for the additional hauling charges it agreed to pay and did pay for the period subsequent to November 16, 1966; or in the alternative that the failure of CBQ to file the special docket application estops CBQ from now collecting the full tariff.
 
 
 4
 The trial court awarded judgment to CBQ in the sum of $12,241.73, the difference between the $21,467.96 in switching charges for the period prior to November 16, 1966, and the $9,226.23 paid to CBQ on February 3, 1967. We affirm the judgment of the trial court with directions to modify the amount of the judgment.
 
 
 5
 The Court notes first that this lawsuit lacks some of the ordinary elements of a true adversary proceeding. During oral argument it became apparent that CBQ brought this action only because it felt legally obligated to do so under the provisions of 49 U.S.C. Sec. 6(7).[3]
 
 
 6
 Oral argument also developed the fact that the stipulation of facts filed by the parties hereto in the district court contained an obviously incorrect statement upon which the trial court relied in regard to the payment of $9,226.23 on February 3, 1967. The exhibits which were attached to the stipulation of facts clearly indicate that the $9,226.23 represented payment for 1,599 cars at $5.77 per car. Of these 1,599 cars, 1,453 were switched prior to November 16, 1966, and 146 were apparently switched subsequent thereto. The proper credit for the period prior to November 16, 1966, is correctly shown by Exhibit No. 1 to be $8,383.81, which is 1,453 cars multiplied by $5.77 per car. The difference between the amount charged pursuant to the tariff ($21,467.96) for the period prior to November 16, 1966, and the amount paid for that period ($8,383.81) is $13,084.15, the amount requested in the complaint filed by CBQ.
 
 Freight Rate Discrimination
 
 7
 The purpose of 49 U.S.C. Sec. 6(7), quoted supra at note 3, is to "have but one rate, open to all alike, and from which there could be no departure." Boston & Maine R.R. v. Hooker, 233 U.S. 97, 112, 34 S.Ct. 526, 528, 58 L.Ed. 868 (1914). So strong is this anti-discrimination provision that the courts have generally refused to recognize an otherwise justifiable defense of estoppel. Thus, in Pittsburg, Cincinnati, Chicago & St. Louis R.R. v. Fink, 250 U.S. 577, 582, 40 S.Ct. 27, 63 L.Ed. 1151 (1919), the consignee of a shipment of goods paid the carrier $15 in freight charges-the amount specified on the bill of lading. It was later learned that the railroad had undercharged the consignee by $15. The Supreme Court held that: "Estoppel could not become the means of successfully avoiding the requirements of [49 U.S.C. Sec. 6(7)] as to equal rates . . ." Id. at 583, 40 S.Ct. at 28. See also New York Central & Hudson River R.R. v. York & Whitney, 256 U.S. 406, 41 S.Ct. 509, 65 L.Ed. 1016 (1921). To put the matter succinctly, "equitable considerations may not serve to justify failure of carrier to collect, or retention by shipper of, any part of lawful tariff charges." Baldwin v. Scott County Milling Co., 307 U.S. 478, 485, 59 S.Ct. 943, 948, 83 L.Ed. 1409 (1939). Although such an approach may create harsh results in individual cases, "instances of individual hardship cannot change the policy which Congress has embodied in the statute in order to secure uniformity in charges for transportation." Pittsburg, Cincinnati, Chicago & St. Louis R.R. v. Fink, supra, 250 U.S. at 582, 40 S.Ct. at 28.
 
 
 8
 This Court has recognized that the "crucial question . . . is whether judicial recognition of [the] estoppel defense will contravene the anti-discrimination purpose of Sec. 6(7)." Southern Pacific Transportation Co. v. Campbell Soup Co., 455 F.2d 1219, 1222 (8th Cir. 1972). In that case, this Court held that where the railroad delivered shipments to the consignee under bills of lading which indicated that the freight charges were to be prepaid, and the consignee in reliance thereon, reimbursed the shipper in full for the freight charges, the consignee was entitled to raise the defense of estoppel against the railroad, after the railroad had unsuccessfully sought payment from the shipper.
 
 
 9
 The Court reasoned that no discrimination could take place, assuming the consignee had paid the full amount of the freight charges to the shipper. The Court concluded that its holding would:
 
 
 10
 not erode the purpose underlying Sec. 6(7) as long as the grounds for estoppel do not serve directly or indirectly as a cover for freight rate discrimination.[4] Id. at 1222.
 
 
 11
 It seems clear that the anti-discrimination provisions of Sec. 6(7) would not, in any way, be furthered by requiring a consignee to pay the freight charges twice. The difference between this case and Southern Pacific Transportation Co. v. Campbell Soup Co., supra, is that in Southern Pacific the consignee had paid the full amount of the existing tariff but to the wrong person. Here the full amount of the existing tariff has not been paid to the railroad or to anyone else.
 
 
 12
 The proper inquiry in this case is whether judicial recognition of the estoppel defense will serve directly or indirectly as a cover for freight rate discrimination. In effect, Concrete Co. claims that it is entitled to a rate at less than the listed tariff because of the agreement heretofore described and because the railroad has failed to perfect a special docket application with ICC in order to seek permission to waive a portion of the tariff. Essentially, Concrete Co., by reference to a private agreement between the parties, seeks to lower the established tariff or attach a nonstatutory condition to the collection thereof.
 
 But as Mr. Justice Brandeis has said:
 
 13
 No contract of the carrier could reduce the amount legally payable; or release from liability a shipper who had assumed an obligation to pay the charges. Nor could any act or omission of the carrier (except the running of the statute of limitations) estop or preclude it from enforcing payment of the full amount by a person liable therefor. . . . Louisville & Nashville R.R. v. Central Iron & Coal Co., 265 U.S. 59, 65, 44 S.Ct. 441, 442, 68 L.Ed. 900 (1924).
 
 Stated differently:
 
 14
 Until changed, tariffs bind both carriers and shippers with the force of law. Under Section 6 of the Interstate Commerce Act the carrier cannot deviate from the rate specified in the tariff for any service in connection with the transportation of property. . . . Lowden v. Simonds-Shields-Lonsdale Grain Co., 306 U.S. 516, 520, 59 S.Ct. 612, 614, 83 L.Ed. 953 (1939).
 
 
 15
 Concrete Co. places principal reliance on the case of Western Maryland R.R. v. Continental Grain Co., 219 F.Supp. 126 (S.D.N.Y.1963). In that case the railroad, which had a dispute with Continental and others with respect to the proper storage and detention charges, agreed with the shippers to abide by a decision in a lawsuit, presenting the same legal question, then pending in Maryland. The Maryland decision resulted in a decision favorable to the shippers. Subsequently, in another circuit, in a case involving different parties but the same legal issue, the Circuit Court held for the carrier, Western Maryland then sought to collect the tariffs, allegedly due, from Continental and others. The New York district court concluded that the stipulation of the parties to abide by the decision in the Maryland lawsuit was binding, and did not violate the provisions of 49 U.S.C. Sec. 6(7).
 
 
 16
 Without deciding whether the Western Maryland decision was correctly decided, that case is distinguishable. Arguably no discrimination took place in that case, since the tariff had been, according to a federal district court, held to be inapplicable. The question implicitly presented in this case, but not in the Western Maryland case, is the effect of such a private agreement prior to the time a ruling has been secured from a court or an administrative agency; that is, does an agreement providing for settlement and submission of the proposed revised tariff to the ICC prohibit collection of the tariff prior to submission? The clear answer to the question is that the parties may not attach a nonstatutory condition to the collection of the tariff: "Until changed, tariffs bind both carriers and shippers with the force of law." Lowden v. Simonds-Shields-Lonsdale Grain Co., supra, 306 U.S. at 520, 59 S.Ct. at 614.
 
 
 17
 The result we reach is not changed by the fact that CBQ failed to file the special docket application as agreed. Under the statute courts may not permit the tariff to be changed or waived whether it be by agreement of the parties, failure to carry out that agreement, or even by stipulation in court.
 
 
 18
 We conclude that the full amount of the tariff must be paid by Concrete Co. to CBQ and that judgment was properly entered by the trial court on behalf of CBQ. However, because of the error of the parties in their stipulation, the amount of the judgment awarded was erroneous. The correct amount of the judgment should have been $13,084.15.[5]
 
 
 19
 The judgment of the trial court is affirmed but with directions to modify the amount of the judgment to $13,084.15.
 
 
 
 [1]
 The switching charge was $13.56 per car from April, 1965, to August, 1965, and $14.92 per car from August, 1965, to November 16, 1966. The amount paid, $9,226.23, represented payment at $5.77 per car for 1,599 cars, 1,453 of which were switched prior to November 16, 1966, and 146 of which apparently were switched thereafter
 
 
 [2]
 CBQ did not file a special docket application with the ICC as agreed. It did request the Western Trunk Line Committee for permission to file the special docket application, but was refused permission. CBQ then proposed to file an independent notice with the Western Trunk Line Committee which would permit it to proceed with such special docket application irrespective of the Committee's stand. Since the Chicago, Rock Island and Pacific Railroad Company was also involved in these movements, it was necessary to obtain its concurrence for publication of the independent notice. By letter dated May 27, 1971, the Rock Island declined CBQ's request and, under established procedures of the ICC, CBQ was unable to pursue the special docket application with the ICC and so advised the ICC by letter dated July 30, 1971
 By letter dated August 10, 1971, the ICC acknowledged receipt of CBQ's July 30, 1971, letter and advised that the special docket file had been closed. A copy of this letter was also served upon Concrete Co., and it was advised of its rights under Rule 25(f) of the ICC's Rules of Practice to initiate a formal Complaint proceeding. Although such advice was timely made, Concrete Co. failed to exercise this right. Concrete Co. acknowledges that these facts are essentially correct but claims that it was not advised that the special docket application had not been perfected until after the case had been submitted to the trial court.
 
 
 [3]
 49 U.S.C. Sec. 6(7) provides:
 No carrier, unless otherwise provided by this chapter, shall engage or participate in the transportation of passengers or property, as defined in this chapter, unless the rates, fares, and charges upon which the same are transported by said carrier have been filed and published in accordance with the provisions of this chapter; nor shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transportation of passengers or property, or for any service in connection therewith, between the points named in such tariffs than the rates, fares, and charges which are specified in the tariff filed and in effect at the time; nor shall any carrier refund or remit in any manner or by any device any portion of the rates, fares, and charges so specified, nor extend to any shipper or person any privileges or facilities in the transportation of passengers or property, except such as are specified in such tariffs.
 
 
 [4]
 Compare Central Warehouse Co. v. Chicago, Rock Island & Pacific R.R., 20 F.2d 828 (8th Cir. 1927)
 
 
 [5]
 Ordinarily this Court would not order a modification of the judgment in favor of the appellee in a case in which the appellee has not filed a cross appeal. See Hadfield v. Ryan Equipment Co., 456 F.2d 1218, 1222 (8th Cir. 1972). But in a case such as this where the appellee has brought this action only because it was required to do so by statute, where the lawsuit lacks some of the ordinary elements of a true adversary proceeding and where the statute (49 U.S.C. Sec. 6(7)) requires the appellee to collect the full amount of the shipping charges, we feel compelled to require this modification in order to carry out the intent of the statute. See 28 U.S.C. Sec. 2106; 9 J. Moore, Moore's Federal Practice p 204.11 at 948-949 n. 9 (1972)